# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | |
|---|---|
| **HAROLD KENNETH PHILLIPS**, ) | |
| Plaintiff ) | |
| ) | Civil Action No.: 2:08cv00031 |
| v. ) | |
| ) | **REPORT AND** |
| **THE BRINK'S COMPANY, et al.,** ) | **RECOMMENDATION** |
| Defendants ) | |
| ) | By: Pamela Meade Sargent |
| ) | United States Magistrate Judge |

In this case, the plaintiff, Harold Kenneth Phillips, seeks a ruling from the court that The Brink's Company Pension-Retirement Plan, ("Plan"), has improperly reduced the amount of the disability pension benefits he is receiving from the Plan. He also seeks a ruling preventing the Plan from recouping any of the benefits it claims that it has overpaid him. This case is currently before the court on the parties' cross motions for summary judgment, (Docket Item No. 25, ("Defendants' Motion"), and Docket Item No. 34, ("Plaintiff's Motion")) ("Motions"). Jurisdiction is conferred upon this court pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §1132. The Motions are before the undersigned magistrate judge by referral, pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following Report And Recommendation.

## I. Facts

There is little, if any, dispute in the relevant facts before the court. Phillips was

-1-

employed by the Pittston Coal Company,[1] ("Pittston Coal"), as an underground coal miner from 1974 to February 1997. From 1974 to early April 1990, Phillips was a member of the United Mine Workers of America, ("UMWA"), and accrued service toward retirement benefits from the United Mine Workers of America Retirement Fund, ("UMWA Fund"). In April 1990, Phillips became a foreman, a nonunion, management position with Pittston Coal.

A calculation of Phillips's estimated retirement benefits was computed on November 21, 1997, by Conley Parsley, Jr., Personnel Manager with Pittston Coal. (Administrative Record (Docket Item No. 26, Exh. 1) (hereinafter "A.R.") at 3-8.) This calculation placed Phillips's monthly normal retirement benefits based on a life annuity at $1,725.22. This calculation shows that Phillips had 23.239 years of benefit accrual service with Pittston, 16.164 years of which was union service. The calculation form has a place for entry of monthly retirement income from other sources, including from the "Union Plan." On Phillips's calculation form the amount listed as monthly retirement income from the Union Plan is $0.00. This calculation was verified by Douglas Harris on November 26, 1997.

On January 13, 1998, Parsley wrote Phillips regarding his estimated retirement

_____

[1]There is a dispute as to whether Phillips was an employee of Pittston Coal or Clinchfield Coal Company. This dispute is not material, however, because both were owned by The Pittston Company. Both companies also participated in the Plan. The Pittston Company, ("Pittston"), divested itself of most of its coal operations in the early 2000s. In 2003, Pittston changed its name to The Brink's Company, and the Pension-Retirement Plan of The Pittston Company and its Subsidiaries changed its name to The Brink's Company Pension-Retirement Plan. Therefore, any references to "Pittston" and "Brink's" will be interchangeable and refer to The Brink's Company, and any references to the "Brink's Plan" or the "Pittston Plan" will be interchangeable and refer to the Brink's Company Pension-Retirement Plan.

-2-

at 1-2.) Parsley's letter stated:

> As of August 21, 1997, you had accrued, based on your salary and service under the Plan, an estimated monthly retirement benefit of $1,725.22. *If you are also awarded a pension from the U.M.W.A. Health and Retirement Fund, a pro rata reduction for any U.M.W.A. pension credit amount earned with any Pittston subsidiary company will be deducted from this estimated amount.*

(Emphasis in original).

Parsley conducted another calculation of Phillips's estimated retirement benefits on October 8, 1998. (A.R. at 11-16.) This calculation placed Phillips's monthly normal retirement benefits based on a life annuity at $1,751.66. This calculation shows that Phillips had 23.793 years of benefit accrual service with Pittston, 16.164 years of which was union service. This calculation form also listed Phillips's monthly retirement income from the Union Plan as $0.00.

In February 1997, Phillips was seriously injured in a mantrip accident. As a result of the injuries he suffered in this accident, Phillips became disabled, and he applied for disability retirement benefits under the Plan. Phillips's application for disability retirement benefits was approved effective November 1, 1998. By letter dated November 5, 1998, Joseph R. Verostic, on behalf of the Plan's Administrative Committee, told Phillips that his application for disability retirement benefits under the Plan had been approved and that he would begin receiving $1,751.66 in monthly benefits. (A.R. at 34-35.)

A Coal Retiree Final Review Checklist regarding Phillips's disability retirement benefits, completed on November 10, 1999, shows that a box regarding "Union Offset? Was it applied?" was checked. (A.R. at 17.)

The Plan paid Phillips $1,751.66 in monthly disability benefits from November 1, 1998, to August 2005. By letter dated July 29, 2005, Rosemary Sanborn, Senior Retirement Services Administrator with Brink's, notified Phillips that his monthly disability benefits had not been properly calculated. (A.R. at 53.) In particular, the letter notified Phillips that "a monthly reduction for a union offset was not applied." The letter further stated that, beginning September 1, 2005, Phillips's monthly disability benefits would be reduced to $1,233.83, a reduction of $517.83 a month. By letter dated August 2, 2005, Sanborn explained that Phillips's disability retirement benefits had been calculated based on a total of 23.790 years of Benefit Accrual Service, 16.333 years of which were based on his union service with the Company. (A.R. at 60-61.)

Sanborn also completed a Pension-Retirement Plan Offset For Union Benefit form regarding Phillips's retirement benefits on July 29, 2005. (A.R. at 59.) This form stated:

> This offset is applied when the employee is:
> 1)     Eligible for a union benefit which was supported in whole or in part by Company contributions; and
> 2)     Where the union service used to calculate the union benefit is also recognized in whole or in part by the Pension-Retirement Plan.

-4-

The form has a blank for "Total Union Benefit Payable," over which Sanborn has handwritten in the word "estimated." This blank contains the figure $341.50. Based on the calculation performed by Sanborn, the offset amount is listed as $341.50.

Phillips filed timely challenges to the Plan's decision to apply the offset and to recoup the alleged overpayment from his monthly benefits. By letter dated November 10, 2005, Frank T. Lennon, on behalf of the Administrative Committee, notified Phillips that $176.33 of the $517.83 reduction in his monthly disability benefits was to recoup "the previous overpayment." (Docket Item No. 1, Exh. 7.) Lennon stated that this reduction would continue until Phillips reached 81 years of age.

Brink's admits that the Administrative Committee utilized a table of benefits contained in the 1990 Wage Agreement with the UMWA to estimate Phillips's union retirement benefits prior to receiving notice from Phillips as to the actual amount of his retirement benefits payable under the UMWA Fund.

Because Phillips was not a member of the UMWA when he became disabled in 1997, he is not eligible to receive a disability pension from the UMWA Fund. Under the UMWA Fund, Phillips did not become eligible to receive early retirement benefits until July 1, 2008, the month after he became 55 years old. The normal retirement age under the UMWA Fund is 62 years of age. The UMWA Fund has credited Phillips with 15.5 years of service. Phillips has not received any retirement benefits from the UMWA Fund to date. If Phillips were to begin to receive early retirement benefits under the UMWA Fund, he would receive $196.35 a month. If Phillips does not receive retirement benefits from the UMWA Fund until he reaches

-5-

62 years of age, Phillips will receive $316.25 a month.

The Plan is an employee benefit plan, as defined under § 1002(3) of Employment Retirement Income Security Act of 1974, ("ERISA"), 29 U.S.C.A. § 1002(3), and Phillips is a participant under the Plan, as defined under § 1002(7) of ERISA, 29 U.S.C.A. § 1002(7). Section 4.05 of the Plan[2] is entitled "Nonduplication of Benefits" and states:

> In any case where Benefit Accrual Service is credited under this Plan, the benefits under this Plan shall be reduced by the value of the Participant's benefit under another retirement plan ... which accrued with respect to service which was also used to calculate his Accrued Benefit under this Plan.

> In the event that the Participant does not provide to the Administrative Committee satisfactory evidence of the amount of his benefit under another retirement plan ... such benefit shall be determined on an estimated basis taking into account total years of service reflected on records of the Company and information reasonably available to the Administrative Committee as to the benefits provided by such other retirement plan.

Section 4.04 of the Plan states:

> Prior to January 1, 1999, if a person's employment with the Company includes periods of service while covered by a collective bargaining agreement that does not provide for participation in the Plan (hereinafter called "Union Service"), such Union Service shall be credited for

---

[2]All references to the Plan are to the Plan as amended and restated effective January 1, 2006. In the earlier version of the Plan amended as of April 18, 1995, the language is virtually identical, although the language is found in differently numbered sections.

purposes of Years of Vesting Service and Benefit Accrual Service after he becomes a Participant in the Plan.

Section 10.03 of the Plan states:

> ...[T]he Administrative Committee shall be responsible for the administration of the Plan and for carrying out its terms. The Administrative Committee ... shall also have the discretionary authority to do the following:
> ...
> (j)    in its sole and exclusive discretion, determine, or cause to be determined, eligibility for benefits under the Plan ..., and the amount due, if any....

Section 18.011 of the Plan states:

> In discharging the duties assigned to it under the Plan, each Named Fiduciary ... shall have discretion to carry out its respective responsibilities under the Plan, including, but not limited to, the Named Fiduciary's duty to interpret the provisions of the Plan. ... [The] ... Fiduciaries' discretionary authority is absolute and exclusive if exercised in a uniform and nondiscriminatory manner with respect to similarly situated individuals and such decisions shall be binding on all person seeking Plan benefits.

Section 1.36 of the Plan lists the Administrative Committee as a Named Fiduciary.

The 1997 Summary Plan Description for the Plan describes the union offset as follows:

> In order to prevent a duplication of benefits, your pension will be reduced by the amount of any benefit you are entitled to receive under a union pension Plan resulting from your service as a union employee of the Company.

-7-

1997 Summary Plan Description at 3. The 2006 Summary Plan Description states:

> If you earned any benefit under a union pension plan with the Company, your Pension-Retirement Plan benefit was or will be reduced by the union plan benefit.

2006 Summary Plan Description at 5. Neither the Plan, nor the Summary Plan Descriptions, contain any language allowing for the recoupment or offsetting of overpayments made to the participants.

If, as Brink's claims, Phillips was overpaid $341.50 a month from November 1998 to August 31, 2005, the total amount of overpaid benefits would be $28,003.00. If Brink's recoups $176.33 a month from September 2005 until Phillips reaches age 81, Brink's would recoup a total of $60,833.85. Brink's admits that the monthly amount withheld to recoup the overpayment to Phillips is based on an actuarial table based on actuarial information contained in the Plan, which includes calculations to convert the recoupment of the overpayment to the present value of money.

Brink's admits that it failed to properly calculate Phillips's benefits in 1998, in that it did not apply any union benefit offset at that time. Brink's also has admitted that it conducted a Voluntary Compliance Review in 1999 and, again, failed to apply any union benefit offset in the calculation of Phillips's benefits. Brink's also admits that it is the Plan Administrator. According to Sanborn, the error in calculating Phillips's benefits in 1998 occurred "because of a ministerial omission," in that an entry for the estimated amount of Phillips's union pension was not entered into the computer program which was used to calculate benefits under the Plan. (Declaration

-8-

of Rosemary Sanborn, Docket Item No. 26, Exh. 9.) Sanborn also claims that when the Plan created a Retirement Services Database in 1999, a checkbox for union service was not properly checked to reflect Phillips's prior union service. Sanborn claims that she discovered that Phillips's benefits had not been offset by his union pension when she was conducting an annual continuing disability review in 2005.

According to Sanborn, the Plan has applied the union offset based on normal retirement age to other Plan participants who have prior union service and have received disability benefits under the Plan, but have not yet begun to receive any union benefits. Sanborn stated that an audit was performed of all old Pittston disability files in October 2005. During this audit, it was discovered that others had been overpaid benefits under the Plan because the union offset had not been properly applied. Sanborn stated that, in each of these cases, benefits were adjusted to offset the participant's union benefits and to recoup the amount of overpayment.

Sanborn was deposed on December 23, 2008. (Docket Item No. 35, Exh. 1.) In her deposition, Sanborn testified that she was not involved in the original calculation of Phillips's pension benefits and, therefore, she was not sure why the error occurred. (Docket Item No. 35, Exh. 1 at 87.) Sanborn also admitted that the Plan had all the information it needed to apply and calculate the union offset when Phillips first applied for disability benefits. (Docket Item No. 35, Exh. 1 at 98.) In fact, Sanborn testified that it was Parsley's practice not to apply a union offset in calculating disability benefits under the Plan. (Docket Item No. 35, Exh. 2 at 147-48.) Sanborn also testified that Parsley's predecessors did apply the union offset in calculating disability benefits under the Plan.

Phillips was deposed on January 9, 2009. (Docket Item No. 35, Exh. 4.) Phillips testified that he thought the union offset had been applied in the original calculation of his disability pension benefits under the Plan. (Docket Item No. 35, Exh. 4 at 89-90.) Phillips explained that he had received an earlier estimate that his full normal retirement benefits would be $2,471.00 a month. (Docket Item No. 35, Exh. 4 at 90.) When he was told that his monthly disability benefits would be only $1,751.00 a month, he assumed it was because the offset had been applied. (Docket Item No. 35, Exh. 4 at 89-90.) Phillips provided the court with a copy of his 1997 Benefit Statement provided to him by Pittston. (Docket Item No. 35, Exh. 9.) This Benefit Statement estimated that Phillips's full normal retirement monthly benefits under the Plan would be $2,471.00. (Docket Item No. 35, Exh. 9 at 174.)

Phillips also has provided a declaration to the court stating that he had no reason to believe that he was being overpaid under the Plan until he was notified that his benefits were being reduced by Sanborn's July 29, 2005, letter. (Docket Item No. 35, Exh. 8.) Phillips also stated that the reduction in his monthly benefits has created a substantial economic hardship for him and his family. Phillips also has admitted that he did not receive a copy of any Summary Plan Description for the Plan until Sanborn mailed him one in 2006.

Parsley has provided a declaration to the court stating that he did not have authority to modify or interpret the terms of the Plan when he performed calculations of retirement benefits. (Docket Item No. 38, Exh. 1.)

*II. Analysis*

As stated above, Phillips's suit seeks a ruling from the court that the Plan has improperly reduced the amount of his disability pension benefits. He also seeks a ruling preventing the Plan from recouping any of the benefits it claims that it has overpaid him. Phillips's Complaint contains seven counts. In Count I of his Complaint, Phillips claims that the Plan's action violates the clear language of the Plan or is based on an unreasonable interpretation of the Plan's language. Count II seeks recovery of the reduction in Phillips's benefits under an equitable restitution theory. Count III seeks to prevent the Plan from recouping the amount it alleges that it has overpaid Phillips. Count IV alleges that the Plan has violated its fiduciary duty to provide accurate information to Phillips about his benefits under the Plan, and, therefore, should be estopped from applying the offset or recouping any overpayment. Count V claims that the Plan has waived its right to apply the offset or to recoup any overpayment based on its seven-year history of paying Phillips $1,751.66 a month. Count VI claims that the Plan should be estopped from applying the offset or recouping any overpayment based on Phillips's reliance on its misrepresentations as to the amount of his monthly disability retirement benefits. Count VII alleges that the Plan's recoupment of overpaid benefits violates the language of the Plan or is an unreasonable interpretation of the Plan.

This case is currently before the court on the parties' cross motions for summary judgment. With regard to a motion for summary judgment, the standard for review is well-settled. The court should grant summary judgment only when the pleadings, responses to discovery and the record reveal that "there is no genuine issue

-11-

as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see, e.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986). A genuine issue of fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

In considering a motion for summary judgment, the court must view the facts and the reasonable inferences to be drawn from the facts in the light most favorable to the party opposing the motion. *See Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. In order to be successful on a motion for summary judgment, a moving party "must show that there is an absence of evidence to support the non-moving party's case" or that "the evidence is so one-sided that one party must prevail as a matter of law." *Lexington-South Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 233 (6th Cir. 1996).

ERISA is a comprehensive statute designed to protect the interests of employees and their beneficiaries in pension and welfare benefit plans. *See Anweiler v. Am. Elec. Power Serv. Corp.,* 3 F.3d 986, 989-90 (7th Cir. 1993) (citing *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 90 (1983)). Under the provisions of ERISA, all employee benefit plans must be established by a written instrument. *See* 29 U.S.C.A. § 1102(a)(1) (West 2009). The provisions of ERISA also require a plan administrator to furnish all plan participants with a copy of a summary plan description, ("SPD"), which is "written in a manner calculated to be understood by the average plan participant" and which will "reasonably apprise such participants and beneficiaries of their rights and

-12-

obligations under the plan." 29 U.S.C.A. § 1022(a) (West 2008). Furthermore, federal regulations require that the SPD must contain, among other things, the "circumstances which may result in disqualification, ineligibility, or denial, loss, forfeiture, suspension, offset, reduction, or recovery" of any plan benefits. 29 C.F.R. § 2520.102-3(l) (2008). Also, Fourth Circuit precedent holds that "if there [is] a conflict between the complexities of the plan's language and the simple language of the SPD, the latter would control," *Pierce v. Sec. Trust Life Ins. Co.*, 979 F. 2d 23, 27 (4th Cir. 1992), if the claimant can "'show some significant reliance upon, *or* possible prejudice flowing from, the faulty plan description.'" *Aiken v. Policy Mgmt. Sys. Corp.*, 13 F.3d 138, 141 (4th Cir. 1993) (quoting *Govoni v. Bricklayers, Masons & Plasterers Int'l Union, Local No. 5 Pension Fund*, 732 F.2d 250, 252 (1st Cir. 1984)).

"ERISA plans are contractual documents which, while regulated, are governed by established principles of contract and trust law." *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 88 (4th Cir. 1996). "Because an ERISA plan is contractual in nature," the courts should use "standard contract principles and look to the plan's language to determine whether the plan confers discretion on the administrator ... and what the scope of that discretion is." *Haley,* 77 F.3d at 88. The parties in this case agree that the Plan gives the Administrative Committee discretionary authority to determine who is eligible to receive benefits and the amount of those benefits so long as that discretion is "exercised in a uniform and nondiscriminatory manner with respect to similarly situated individuals...." The parties further agree that the Plan gives all fiduciaries, including the Administrative Committee, the discretion to interpret the terms of the Plan.

"When a plan by its terms confers discretion on the plan's administrator to

-13-

interpret its provisions and the administrator acts reasonably within the scope of that discretion, courts defer to the administrator's interpretation." *Colucci v. Agfa Corp. Severance Pay Plan*, 431 F.3d 170, 176 (4th Cir. 2005). To the extent the administrator enjoys discretion to interpret the terms of a plan, such interpretive discretion, however, applies only to ambiguities in the plan. *See Blackshear v. Reliance Standard Life Ins. Co.,* 509 F.3d 634, 639 (4th Cir. 2007). "[T]he administrator is not free to alter the terms of the plan or to construe unambiguous terms other than as written." *Colucci*, 431 F.3d at 176.

Thus, the court in this case must first determine whether the unambiguous language of the Plan resolves the issues before it. If it does, there is no need to continue. If the language of the Plan does not resolve the issues before the court, the court must then determine whether Brink's interpretation of the Plan was reasonable and whether it was exercised in a uniform and nondiscriminatory manner. In determining whether a fiduciary's discretionary decision was reasonable, the court should consider a number of factors, including "(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have." *Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000). In *Metropolitan Life Insurance Co. v. Glenn*, ___ U.S. ___, 128 S. Ct.

-14-

2343, 2346, 2348-50 (2008), the Supreme Court recently held that a conflict of interest does exist when a plan administrator serves in the dual role of evaluating claims for benefits and paying the claims. The *Glenn* Court also held, however, that a conflict of interest is just one of the "several different, often case-specific, factors" to be considered in determining whether an administrator has abused its discretion. 128 S. Ct. at 2351. *See also Champion v. Black & Decker*, 550 F.3d 353, 355-56 (4th Cir. 2008).

The language at issue in this case is found in Section 4.05 of the Plan, which states:

> In any case where Benefit Accrual Service is credited under this Plan, the benefits under this Plan shall be reduced by the value of the Participant's benefit under another retirement plan ... which accrued with respect to service which was also used to calculate his accrued benefit under this Plan.

The parties in this case agree that Phillips's 15.5 years of service with Pittston as a union member have been used to calculate benefits under both the UMWA Plan and the Pittston Plan. That being the case, this section plainly states that Phillips's benefits under this Plan "shall be reduced by the value" of his benefit under the UMWA plan. The Plan does not, however, define what is meant by the phrase "the value of the Participant's benefit" under another retirement plan.

The parties agree that Phillips is not eligible to receive a disability pension from the UMWA fund. The parties also agree that Phillips was not eligible to receive any pension benefits from the UMWA Fund until he recently turned 55. At age 55,

-15-

Phillips is now eligible to begin receiving early retirement benefits from the UMWA of $196.35 a month, but he does not do so. The parties also agree that Phillips is not eligible to begin receiving normal retirement benefits of $316.25 from the UMWA Fund until he reaches the age of 62.

Phillips argues that, because he has not received any benefits from the UMWA Fund, his UMWA Fund benefits have no value and, therefore, Brink's has improperly applied the offset provided for in Section 4.05 to reduce his benefits. Brink's argues that, under Section 4.05, it is required to reduce Phillips's disability pension benefits by the full amount of any accrued union pension benefit he would be eligible to receive in the future. I find that neither of these positions is required by the plain language of the Plan.

Merriam-Webster's Collegiate Dictionary defines the word "value" as meaning "the monetary worth of something," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 1305 (10th ed. 1993), a definition shared by numerous sources. *See also* WEBSTER'S II NEW COLLEGE DICTIONARY 1219 (2001); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 1414-15 (1981). Webster's New World Dictionary, however, explicitly states an additional concept regarding the meaning of "value," which I believe is implicit in all such definitions. Webster's New World Dictionary defines "value" as "the worth of a thing in money or goods *at a certain time*." WEBSTER'S NEW WORLD DICTIONARY 1568 (2nd ed. 1970) (emphasis added). With recent economic conditions, we all have become acutely aware of the reality that the value of goods and property may appreciate -- or depreciate -- over time.

-16-

The idea that an entitlement to a payment in the future has some current worth or value is widely recognized in the law. For instance, courts routinely place a present value on damages to be suffered in the future. *See JTH Tax, Inc. v. H&R Block E. Tax Servs., Inc.*, 245 F.Supp. 2d 749, 753 (E.D. Va. 2002) (citing *Jones & Laughlin Steel Corp v. Pfeifer*, 462 U.S. 523 (1983). Also, domestic relations courts routinely place a current value on a spouse's entitlement to future retirement benefits for purposes of assessing and dividing marital property. *See McGinniss v. McGinniss*, 638 S.E.2d 697, 700 (Va. Ct. App. 2006) (quoting *Torian v. Torian*, 562 S.E.2d 355, 360 (Va. Ct. App. 2002)). Therefore, I find no merit to Phillips's argument that his union benefits have no value until he begins receiving them.

I also reject Phillips's argument that any ambiguities in the Plan must be construed against the drafter under the "contra proferentum" rule. In *Carden v. Aetna Life Insurance Company*, 559 F.3d 256, 260 (4th Cir. 2009), the Fourth Circuit recently held that application of the contra proferentum rule was inappropriate under the Supreme Court's holding in *Glenn* that an administrator's conflict of interest is "one factor among many" in determining the reasonableness of the administrator's exercise of discretion. "[W]henever a plan administrator employs its interpretive discretion to construe an ambiguous provision in favor of its financial interest, that fact may be considered as a factor weighing against the reasonableness of its decision." *Carden* at 261.

Having determined that the plain language of the Plan does not resolve the dispute before the court, the court next must determine whether Brink's interpretation of the Plan language at issue abused its discretion. In this case, Brink's has interpreted

-17-

the phrase "value of the Participant's benefit under another retirement plan" to mean the full amount of normal retirement benefits Phillips will be eligible to receive in the future from the UMWA. Having considered the factors set forth in *Booth* with regard to the facts of this case, I find that the Plan's fiduciaries did not abuse the discretion given to them.

Based on the language of the Plan, it is clear that an offset in benefits was intended. It is further clear that the language of the Plan anticipated that there might be times when the offset would be applied before the exact amount of benefits payable to a participant under another retirement plan was known. While the language of the 1997 SPD suggests that the benefits payable under the Brink's Plan would be reduced only by other benefits the participant was currently receiving, Phillips makes no argument that he was aware of the terms of the 1997 SPD or that he relied on this information. Furthermore, the language of the 2006 SPD seems to suggest that the offset will be applied whenever any other benefit has been "earned," regardless of whether it is being received or not. Also, there is no dispute that the information before the administrator was adequate to make the decision or that the information supports the decision to offset benefits in the amount offset. In fact, the administrator at first estimated what Phillips's normal monthly retirement benefits would be under the UMWA Plan and then readjusted the offset amount when the UMWA Plan actually provided information to Phillips regarding what his normal monthly retirement benefits would be. While the Plan does not define what is meant by "value of the Participant's benefit under another retirement plan," it is not unreasonable to offset the payment of full normal retirement benefits under the Brink's Plan by the amount of full normal retirement benefits that will be payable under the UMWA Plan.

-18-

Brinks also has provided evidence that, but for pension calculation performed for a number of years by Parsley at its Pittston Coal division, it has consistently interpreted this Plan language to provide for an immediate offset of any earned, but not yet received, Union pension benefit. In fact, the only fact supporting a finding of abuse of discretion would be that the fiduciary here functions under a conflict of interest in both administering and funding the fund that pays all claims for retirement benefits.

Having determined that there is no genuine issue of material fact, and, having determined that Brink's interpretation of the Plan was not unreasonable, I must recommend that the court enter summary judgment in the defendants' favor as to Phillips's denial of benefits claim contained in Count I of the Complaint. In Count VII of his complaint, Phillips also claims that the Plan may not recoup any benefits it overpaid him because recoupment is not provided for in the Plan itself. I also recommend that the court grant summary judgment in the defendants' favor as to this count because a right of recoupment of an overpayment by an ERISA plan may exist based on the facts and circumstances of the case regardless of whether recoupment is provided for in the plan language.

Both ERISA and ordinary trust law impose a duty upon the Plan's fiduciaries to act in the interest of the Plan's beneficiaries. *See* 29 U.S.C.A. § 1104(a)(1) (West 2009); *Faircloth v. Lundy Packing Co.,* 91 F.3d 648, 656 (4th Cir. 1996) (fiduciary responsibility provisions of ERISA invoke common law trusts); *Griggs v. E.I. DuPont de Nemours & Co.,* 237 F.3d 371, 380 (4th Cir. 2001) (ERISA's fiduciary responsibility provisions codify common law of trusts, and common law of trusts requires duty to act in interest of all beneficiaries); *see also Best v. Cyrus*, 310 F.3d

-19-

932, 935 (6th Cir. 2002) (citing 29 U.S.C. § 1104(a)(1) and *Varity Corp. v. Howe*, 516 U.S. 489, 496 (1996)). That being the case, a plan fiduciary must be free to seek recoupment of plan assets when the facts and circumstances justify it. Turning my attention to Phillips's remaining claims for equitable restitution, estoppel and waiver, I hold that the law in this circuit does not allow such claims when the language of the Plan clearly allows for the offset of benefits and the fiduciaries' exercise of discretion in applying the offset was reasonable.

In enacting ERISA, Congress intended that the courts would "develop a 'federal common law of rights and obligations under ERISA-regulated plans.'" *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110 (1989) (quoting *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 56 (1987)). The Fourth Circuit, however, has held that "resort to federal common law generally is inappropriate when its application would conflict with the statutory provisions of ERISA, ... or threaten to override the explicit terms of an established ERISA benefit plan." *Singer v. Black & Decker Corp.,* 964 F.2d 1449, 1452 (4th Cir. 1992) (citing *Provident Life & Accident Ins. Co. v. Waller,* 906 F.2d 985, 992 (4th Cir. 1990)). The Fourth Circuit also has held specifically that the common-law doctrine of equitable estoppel is not available to modify the written terms of an ERISA plan in the context of a participant's suit for benefits. *See Coleman v. Nationwide Life Ins. Co.,* 969 F.2d 54, 58-60 (4th Cir. 1992); *see also HealthSouth Rehab. Hosp. v. Am. Nat'l Red Cross*, 101 F.3d 1005, 1010 (4th Cir. 1996).

Despite the defendants' arguments to the contrary, however, the Fourth Circuit has not held that claims of estoppel and waiver are never applicable in ERISA cases. In fact, the Fourth Circuit has specifically upheld a decision of this court applying

-20-

equitable principles in crafting an appropriate remedy involving these very defendants. *See Adams v. Brink's Co.*, 261 Fed. App'x 583 (4th Cir. 2008) (affirming *Adams v. Brink's Co.*, 420 F. Supp. 2d 523 (W.D. Va. 2006)). Furthermore, this court has recognized that estoppel principles may be invoked in ERISA cases where the action at issue is an interpretation of an ambiguous plan provision. *See Shelton-Tilley v. Prudential Ins. Co.*, 168 F. Supp. 2d 584, 588 (W.D. Va. 2001). In particular, under *Booth*, equitable principles should be considered when a court determines whether a fiduciary's interpretation was consistent with earlier interpretations of the plan. *See Booth*, 201 F.3d at 342-43.

In this case, the language of the Plan clearly provides for an offset of benefits, without specifying when and how this offset will occur. The court has found no genuine issue of any material fact and has found, based on the undisputed facts, that the Plan's interpretation and application of this offset provision was within the discretion granted it. In reaching this conclusion, the court has specifically found that there has been no evidence presented that the application of the union offset in this case presents an inconsistent, inequitable interpretation of the Plan. That being the case, I hold that Phillips should not be able to pursue his separate equitable claims for equitable restitution, waiver and estoppel. Therefore, I recommend that the court enter summary judgment in the defendants' favor on all remaining claims except Phillips's breach of fiduciary duty claim contained in Count IV.

Regarding Phillips's breach of fiduciary duty claim, I find that there is no genuine issue of material fact and that Phillips is entitled to judgment as a matter of

law on this claim. In *Varity Corp.*, 516 U.S. 489, the Supreme Court recognized the rights of individual participants to sue a person acting as a fiduciary under an ERISA plan for breach of fiduciary duty. To establish such a claim, the plaintiff must show 1) that a defendant was a fiduciary of the ERISA plan; 2) that a defendant breached its fiduciary responsibilities under the plan; and 3) that the participant is in need of injunctive or "other appropriate equitable relief" to remedy the breach. *Blair v. Young Phillips Corp.*, 235 F. Supp. 2d 465, 470 (M.D. N.C. 2002) (citing *Griggs*, 237 F.3d at 379-80). The defendants incorrectly argue that a plaintiff pursuing a breach of fiduciary duty claim on a misrepresentation must show reliance on the representation. While reliance is important with regard to what, if any, remedy is awarded, it is not required to prove the claim.

As stated above, the Supreme Court has held that the fiduciary responsibility provisions of ERISA invoke the common law of trusts. *See Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985); *Faircloth,* 91 F.3d at 656 (citing *Cent. States* for this proposition). In *Varity Corp.*, the Supreme Court recognized that "ERISA requires a 'fiduciary' to 'discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries.'" 516 U.S. at 506 (citations omitted). Furthermore, the Court held "[t]o participate knowingly and significantly in deceiving a plan's beneficiaries ... is not to act 'solely in the interest of the participants and beneficiaries.'" *Varity Corp.*, 516 U.S. at 506; *see also Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983) ("Lying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in [29 U.S.C. § 1104].");  *Harte v. Bethlehem Steel Corp.*, 214 F.3d 446, 452 (3rd Cir. 2000) (ERISA administrators have a fiduciary obligation "not to misinform

-22-

employees through material misrepresentations and incomplete, inconsistent or contradictory disclosures.") (citation omitted); *Drennan v. Gen. Motors Corp.*, 977 F.2d 246, 251 (6th Cir. 1992) (stating that an employer violates its fiduciary duties by misleading employees regarding the availability of participation in a plan). "[W]hen a plan administrator speaks, it must speak truthfully." *Fischer v. Philadelphia Elec. Co.*, 994 F.2d 130, 135 (3rd Cir. 1993).

The defendants concede that the information that was provided to Phillips in the Administrative Committee's November 5, 1998, letter regarding the amount of his monthly disability retirement benefits was inaccurate. The defendants argue, however, that Phillips cannot succeed, as a matter of law, on his breach of fiduciary duty claim because he cannot show that the misrepresentation contained in this letter was made by a fiduciary of the Plan. The defendants' argument fails under this court's and the Fourth Circuit's previous rulings in the *Adams* case. In *Adams*, as in this case, the plaintiff was notified by letter from the Plan's Administrative Committee that his application for retirement benefits had been approved and notifying him of the amount of his monthly benefits. In *Adams*, this court specifically found, and the Fourth Circuit affirmed, that the Administrative Committee's actions in passing on inaccurate information breached its fiduciary duty to communicate accurately with a plan beneficiary. *See Adams*, 261 Fed. App'x at 595. In *Adams*, unlike here, the defendants did not contest that the Administrative Committee was a fiduciary of the Plan. *See Adams*, 261 Fed. App'x at 595. The fact that the defendants in this case assert that this misrepresentation was not made by a fiduciary is disingenuous. The undisputed evidence presented shows that the Administrative Committee is a named fiduciary under the Plan. (A.R. at 170.) Further, the Plan specifically gives the Administrative

-23-

Committee the power, "in its sole and exclusive discretion" to determine the eligibility for and amount of benefits payable under the Plan. (A.R. at 227-A.)

Furthermore, under 29 U.S.C. § 1132(a)(3), the courts may award "appropriate equitable relief" for breach of fiduciary duty under ERISA. *See Griggs*, 237 F.3d at 384. I believe the relief appropriate in this case is to prevent the Plan from recovering any of the benefits it has overpaid to Phillips. As stated above, the fiduciary responsibility provisions of ERISA invoke the common law of trusts.

> If the trustee by mistake or otherwise makes an overpayment to the beneficiary, he cannot recover the amount of the overpayment from the beneficiary personally or out of the beneficiary's interest in the trust estate, if the beneficiary had no notice that he was overpaid and has so changed his position that under all the circumstances it is inequitable to the beneficiary to permit such recovery. Among the circumstances which may be of importance in determining whether it is inequitable to allow the trustee indemnity are the following: (1) what disposition has been made by the beneficiary of the amount by which he was overpaid; (2) the amount of the overpayment; (3) the nature of the mistake made by the trustee, whether he was negligent or not; (4) the time which has elapsed since the overpayment was made.

RESTATEMENT (SECOND) OF TRUSTS, Section 254, cmt. d (1959).

In this case, the failure to offset Phillips's earned union benefits from his Plan benefits was due to the sole negligence of the Plan itself and those to whom it delegated the administration of the Plan. In particular, the Plan admits that it had all the information it needed to apply the offset before it when Phillips applied for

-24-

disability retirement. Further, it is undisputed that Phillips had no knowledge that he had been overpaid until he was notified of the overpayment by the Plan in 2005. Also, it is undisputed that Phillips used the amounts he was overpaid as he received them to pay his routine expenses. Also, these overpayments continued for a period of approximately seven years before they were discovered. Based on these facts, I find that it is inequitable to require Phillips to reimburse any of the amounts the Plan overpaid him. Therefore, I recommend that the court enter summary judgment in Phillips's favor on this claim and order that the defendants stop withholding any amounts from his monthly benefits to recoup their overpayment and to repay Phillips the $173.66 withheld from his monthly benefits from September 1, 2005, to the present.

## Proposed Findings of Fact and Conclusions of Law

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. There is no genuine issue of material fact;
2. The language of the Plan provides for an offset of the value of a participant's benefit under another retirement plan, which accrued with respect to service used to also calculate benefits under the Plan;
3. The language of the Plan does not define how the value of a participant's benefit under another retirement plan will be determined;
4. Brink's did not abuse its discretion in defining the "value" of a participant's benefit under another retirement plan as the full amount of normal retirement age benefits earned, but not yet received, from a plan;
5. ERISA law allows for the recoupment of overpaid benefits even if the plan at issue does not specifically allow it;

Case 2:08-cv-00031-JPJ-PMS   Document 55   Filed 05/12/09   Page 25 of 27   Pageid#: 1440

6.     ERISA law does not allow Phillips to pursue equitable claims of restitution, estoppel and waiver because the Plan clearly allowed for the offset of benefits, and the fiduciaries' exercise of discretion in applying the offset was reasonable;

7.     The Administrative Committee's November 5, 1998, letter to Phillips incorrectly advised him as to the amount of his monthly disability retirement benefits;

8.     The Administrative Committee is a Named Fiduciary under the Plan and was acting as a fiduciary when it accepted Phillips's claim for disability retirement benefits by its November 5, 1998, letter;

9.     The misrepresentation contained in the Administrative Committee's November 5, 1998, letter to Phillips breached its fiduciary duty to communicate accurately with beneficiaries; and

10.     The recoupment by the Plan of any overpayments made to Phillips is inequitable under the facts and circumstances of this case.

## Recommended Disposition

Based upon the above-stated reasons, the undersigned recommends the court grant summary judgment in the defendants' favor on all claims except the breach of fiduciary duty claim. The undersigned recommends that the court grant summary judgment in favor of Phillips on his breach of fiduciary duty claim, and I find that, while the Plan may reduce Phillips's disability retirement benefits to offset his pension benefits earned under the UMWA Plan beginning September 1, 2005, the Plan may not recoup any of the benefits it overpaid to Phillips from November 1998 to September 1, 2005.

## <u>Notice To Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636 (b)(1)(C):

Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed finding or recommendation to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence to recommit the matter to the magistrate judge with instructions.

Failure to file written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in the matter to the Honorable James P. Jones, Chief United States District Judge.

The clerk is directed to send copies of this Report and Recommendation to all counsel of record.

**DATED:** This 12th day of May 2009.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

-27-